The appellant, Vernon Lamar Yancey, was convicted of murdering Mattie Sports during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended that Yancey be sentenced to death. The trial court accepted the jury's recommendation and sentenced Yancey to death by electrocution.
Because we are reversing this case on a Batson v. Kentucky, 476 U.S. 79
(1986), claim we will not recite the facts surrounding the offense.
Yancey argues that the prosecutor violated Batson, by using 12 of his 15 strikes to remove black prospective jurors from the venire. The United States Supreme Court in Batson held that black prospective jurors could not be excluded from a black defendant's jury solely on the basis of their race. This holding was extended to white defendants in Powers v.Ohio, 499 U.S. 400 (1991); to defense counsel in criminal cases inGeorgia v. McCollum, 505 U.S. 42 (1992); to white prospective jurors inWhite Consolidated Industries, Inc. v. American Liberty Insurance Co.,617 So.2d 657 (Ala. 1993); and to strikes based solely on gender inJ.E.B. v. Alabama, 511 U.S. 127 (1994).
Specifically, Yancey argues that the reasons given for striking these jurors were merely a pretext or a sham and white prospective jurors sharing the characteristics for which black jurors were removed were not struck. He asserts that the record reflects that the prosecutor exercised disparate treatment when striking black prospective jurors and white prospective jurors. After examining the record, we must agree. We are confident that this case will not withstand the many years of appellate review that follow a case in which the death penalty has been imposed.
The Alabama Supreme Court in Ex parte Branch, 526 So.2d 609 (Ala. 1987), iterated the standard a reviewing court uses when evaluating whether a Batson violation has occurred. The court stated:
 "The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider `all relevant circumstances' which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
 "1. Evidence that the `jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.' [People v.] Wheeler, 22 Cal.3d [258], 280, 583 P.2d [748], 764, 148 Cal.Rptr. [890], 905. For instance `it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
 "2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to *Page 3 
strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
 "3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)], supra.
 "4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 "5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890
(1978).
 "6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, [503] So.2d at 352 and 355.
 "7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
 "8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
 "9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra."
526 So.2d at 622-23. When reviewing a trial court's ruling on a Batson
motion, this court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous. Farriorv. State, 728 So.2d 691 (Ala.Crim.App. 1998); Merriweather v. State,629 So.2d 77 (Ala.Crim.App. 1993); Nance v. State, 598 So.2d 30
(Ala.Crim.App. 1992); and Jackson v. State, 594 So.2d 1289
(Ala.Crim.App. 1991).
Here, Yancey made a Batson objection, the trial court ruled that he had established a prima facie case of racial discrimination. The prosecution then detailed its reasons for striking the black prospective jurors. The prosecutor stated:
 "Mr. Davis [prosecutor]: If it please the Court, the State struck venireman 19, venireperson 19, who is an Afro-American female. We attempted to have her struck for cause. She was at best ambivalent about her attitude toward the death penalty. She indicated that she would require the State to prove beyond all doubt, beyond a shadow of a doubt, to a mathematical certainty the guilt of the Defendant before she could consider the death penalty. In addition to that, she was not very clear on the stand when she answered questions. She was confused. We struck her for those reasons.
 "The State next struck venireman 93. He is an Afro-American male. He indicated in voir dire that he would not impose the death penalty in the case of Timothy McVeigh.[1] He said that he *Page 4 
would not impose the death penalty under any circumstance. We asked that he be struck for cause, but he was not. We struck him for those reasons as well as the fact that he has a number of convictions in district court and in the city traffic court. One of those convictions was for attempting to elude. We struck him for those reasons.
 "The State next struck 109. 109 is an Afro-American female. She too indicated in voir dire that she would vote automatically for life without parole. She couldn't imagine a case in which she would impose the death penalty. She then equivocated and said she might consider it. She also said that she would require the State to prove guilt beyond any doubt before she could consider the death penalty. In addition, she's been convicted of theft on more than one occasion, and we struck her for those reasons.
 "The State next struck venireperson 27, an Afro-American female. This individual we also asked to be struck for cause. She indicated on voir dire that she didn't believe in death penalty; that she would choose life in prison without parole over the death penalty. We struck her for that reason.
 "State next struck venireperson 101. He is a white male who we also asked to be struck for cause. He indicated that the circumstantial evidence would have to be overwhelming in nature in order for him to convict. We struck him for that reason.
 "We next struck venireperson 47. Venireperson 47 is a white — I'm sorry, an Afro-American male. He indicated on voir dire that he would choose life over death. He would have to be convinced beyond all doubt, to a mathematical certainty of guilt before he could consider the death penalty. We had — additionally, I believe, we challenged him for cause as well, but it was not granted. We struck him for that reason.
 "The State next struck venireperson 56. She's an Afro-American female. We had asked after voir dire that she be struck for cause. She was confused, disoriented as to when and were she saw things in the news media. She indicated that she didn't approve of execution. She'd rather give the life sentence. She indicated she had a religious belief that you shouldn't impose the death penalty, and we struck her for that cause.
 "The State next struck venireman 151. He is an Afro-American male. We had challenged him for cause previously. He indicated that he would choose the life sentence over death. He would have a problem with the death penalty. Have to be absolutely certain in order to consider the death penalty. Additionally, he was convicted of DUI in the district court, and we struck him for those reasons.
 "The State next struck — its ninth strike was venireperson 187, a black female. She, additionally, was someone that we had tried to strike for cause. She indicated on voir dire that she would choose life over death in every situation. On further questioning, she equivocated and said there might be some situations in which she would consider the death penalty. She was obviously confused on the stand in several points, and we struck her for those reasons. She also asked to be excused or at least indicated that she had health *Page 5 
difficulties and that she needed to go out of town next week, I believe it was. We struck her for all those reasons.
 "State next struck venireman 118; that was our tenth strike. He is a black male, Afro-American male. He indicated that he opposes the death penalty to some extent; that he favors life in prison without parole over the death penalty. He did say ultimately that he could consider both. Additionally, he has been convicted of a misdemeanor offense as well as traffic offenses in the city. We struck him primarily because of his equivocation about the death penalty.
 "State next struck as its 11th strike venireman 51. He is an Afro-American male. This gentleman has been convicted, according to our records, of assault or at least charged with assault in the first degree, a felony. He had had worthless-check cases. He has three traffic cases, two misdemeanor cases, and a felony case on record at the Phenix City Police Department. We struck him for those reasons.
 "The State, as it 12th strike, struck venireman 196. He is an Afro-American male. This gentleman was on a jury panel several years ago in which a defendant was charged with slashing the throat of his wife at a public place in Phenix City. The panel in that case deadlocked 10 to 2. He was one of the two individuals who refused to return a guilty verdict in this case, and I struck him for that reason. In fact, on his juror card I had written never let this person serve on a jury again."
(R. 1168-74.) On their face, the reasons given by the prosecutor appear to be race neutral; thus, we must evaluate the nine relevant factors articulated by the Alabama Supreme Court in Ex parte Branch, 526 So.2d 609
(Ala. 1987). Hart v. State, 612 So.2d 520 (Ala.Crim.App. 1992), aff'd,612 So.2d 536 (Ala.), cert. denied, 508 U.S. 953 (1993).
We are specifically concerned about the evidence indicating disparate treatment in this case. After hearing the reasons, the trial court inquired about whether any of the white empaneled jurors had misdemeanor or traffic convictions. A detailed discussion ensued during which the prosecutor expounded on the background of the empaneled jurors. Six of the white empaneled jurors had had prior traffic offenses and misdemeanor offenses. One of these jurors, prospective juror number 185, had 12 prior traffic offenses and two prior misdemeanor offenses. The trial court expressed concern as to why this white juror was not struck when black prospective jurors were struck for having committed similar offenses. The following occurred:
 "The Court: So as I understand, some of your strikes had to do with the number of traffic offenses or misdemeanor charges?
 "Mr. Davis: It had to do with the nature and the number, yes, sir.
"The Court: And let's go back to 185.
"Mr. Davis: Yes, sir.
 "The Court: Some 14 traffic, did you say, and several misdemeanors.
 "Mr. Davis: Actually, it says 12 traffic, 2 misdemeanors and 1 felony. I would assume since he didn't answer that the felony was not a conviction.
 "The Court: Does that change your — after review of that, does that change any of the strikes that you would —
 "Mr. Davis: Probably so, Judge. I probably would have struck him had I noticed that, although I did write that he appeared to be a strong-willed juror and we put a plus by his name after voir dire. *Page 6 
 "The Court: Okay. So with that, do you wish to maintain that that strike, I believe, of 185 on or do you wish to review one of your previous strikes or not? The reasons why I'm asking is, you talked about the criminal history of some of these other people and what I'm asking is, with that type of criminal history you just related for 185, whether that — you still maintain there's some factor that outweighs that. Could you differentiate leaving that person on the jury versus a strike of someone else?
 "Mr. Davis: To me, the strong opinion he gave about McVeigh. He was very strong about his feelings and his opinions. We felt like he would be a strong force on the jury. Now, that could be good or bad for the State from that perspective, as the Court well knows, but we thought he was a strong-willed individual.
 "The Court: I'm asking — you said if you had observed that before, that may have made a difference. I'm just asking, do you wish to review any strike?
"Mr. Davis: No, sir.
 "The Court: Okay. Anything else the defense wishes to state?
 "Mr. Ivins [defense counsel]: Judge, for the record, we would state it's obvious from the explanations by the State that whether or not they had traffic offenses had no bearing whatsoever other than a convenient way to strike the blacks off the jury; that's the only reason he would even mention it. Most of the white people that had traffic tickets they did not strike off, and Mr. W. [juror number 185] is an egregious example of that. We demand that the jury be redrawn and struck over from the beginning with instructions to the State to not use race as a basis for its strikes.
 "The Court: Well, the motion to have another venire drawn is denied. As I understand what the State is saying with regards to 185, there's some — the State's position is that his opinions regarding a possible death sentence outweighs the other —
 "Mr. Davis: That's our opinion, Judge. We made a judgment of all the jurors based on the answers they gave in individual voir dire, based on the feelings we had about them, their appearance. This gentleman was neat. He is a businessman. I don't know about the felony. In fact, I didn't notice that that charge was on there until just then when I went through it again, but I left him because of his responses."
(R. 1175-83.) Prospective juror 185, who was white, was left on the jury because, the prosecutor said, he was not aware of the jurors's prior convictions. We are troubled that the prosecutor did not wish to remove prospective juror number 185 even after he learned that he had 12 prior traffic offenses — several black prospective jurors were removed for a similar reason. This shows a discriminatory intent on the part of the prosecutor. Also, five other white jurors who had prior traffic or misdemeanor records were not struck. Moreover, when the trial court asked the prosecutor about the records relating to the white jurors who had been empaneled, the prosecutor was not familiar with this information. (The record indicates a pause while the prosecution retrieved this information.) It appears that the prosecution was not familiar with this information when striking the jury.
Here, the trial court concentrated on the failure of the State to strike prospective juror 185, but gave no more than a cursory review to the prosecutor's reasons for not striking the remaining empaneled jurors who shared characteristics with some of the blacks removed. This is clearly evidenced by the record of the Batson hearing. *Page 7 
In addition to prospective juror 185, the following white prospective jurors where not struck: prospective juror number 24, who had two worthless-check convictions and traffic convictions; prospective juror number 122, who had four traffic offenses; prospective juror number 152, who had three traffic offenses; prospective juror number 161, who had three traffic offenses; and prospective juror number 197, who had five traffic offenses and who also indicated during voir dire that he favored a sentence of life imprisonment without parole instead of death. The trial court did not receive an adequate explanation as to why these jurors remained on the venire when black prospective jurors with traffic and misdemeanor convictions were struck by the prosecution.
Also, another reason given for striking several of the black jurors — their views toward capital punishment — appears to have been exercised disparately. The record reveals that this reason was shared by at least one white prospective juror who was not struck. Prospective juror 197 indicated that he favored a sentence of life imprisonment without parole over the death penalty, but that he could follow the court's instructions. (R. 1030.)[2]
Though we have held that striking a prospective juror because of a prior criminal history is a race-neutral reason, we have also held that the failure to strike both whites and blacks because of prior criminal records is evidence of disparate treatment, in violation of Batson. SeePowell v. State, 548 So.2d 590 (Ala.Crim.App. 1988), aff'd, 548 So.2d 605
(Ala. 1989). "Such disparate treatment of otherwise similarly situated persons who happen to be of different racial backgrounds, would evidence discriminatory intent in the State's use of its strikes." Bishop v.State, 690 So.2d 498, 500 (Ala.Crim.App. 1995), on remand, 690 So.2d 502
(Ala.Crim.App. 1996). See also Russell v. State, 739 So.2d 58
(Ala.Crim.App. 1999); Wright v. State, 601 So.2d 1095 (Ala.Crim.App. 1991); and Mitchell v. State, 579 So.2d 45 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala. 1992). The prosecutor's reasons for striking prospective jurors numbers 93, 118, and 151, evidence disparate treatment.
As this Court stated in Powell, 548 So.2d at 593-94:
 "In view of the fact that five members of the jury were in their twenties (the average age of the jury was only 31 years, 8 months) and seven members of the jury had had traffic offenses equally as serious as those of the black venirepersons who were struck by the State, we cannot escape the conclusion that the State engaged in the type of `disparate treatment' denounced in Branch. White `persons with the same or similar characteristics as the challenged [black] juror[s] were not struck.' Branch, 526 So.2d at 624. See Acres v. State, 548 So.2d 459 (Ala.Cr.App. 1987) (on return to remand) (validity of prosecutor's reasons for striking two black venirepersons because they had had traffic citations did not `stand up under close scrutiny' when record revealed that two white jurors who served on jury had similar traffic offenses). The State simply did not remove white persons for the same reasons given by the State for removing blacks. Compare Currin v. State, 535 So.2d 221 *Page 8 
(Ala.Cr.App. 1988) (`A reasonable conclusion . . . is that [the prosecutor] applied the racially neutral criteria of education, employment, and demeanor to all jurors, whether black, [or] white. . . .') (quoting United States v. Allen, 666 F. Supp. 847, 854
(E.D.Va. 1987)). See generally State v. Antwine, 743 S.W.2d 51, 65 (Mo.), cert. denied, Antwine v. Missouri, [488] U.S. [1017], 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), wherein the court found it highly relevant to consider `whether similarly situated white veniremen escaped the State's challenges.'"
In Carrick v. State, 580 So.2d 31, 32 (Ala.Crim.App. 1990), we stated:
 "In the instant case, the State engaged in the type of disparate treatment denounced in Branch. See also Acres v. State, 548 So.2d 459 (Ala.Cr.App. 1987) (wherein this Court held that the validity of the prosecutor's reasons for striking two black venirepersons because they had had traffic citations did not `stand up under close scrutiny' when the record revealed that two white jurors who served on the jury had similar traffic offenses, at 473). Here, as in Acres, the State simply did not remove white persons for the same reasons given by the State for removing blacks."
"`[D]isparate treatment furnishes strong evidence of discriminatory intent.'" Freeman v. State, 651 So.2d 576 (Ala.Crim.App. 1994), quotingEx parte Bird, 594 So.2d 676, 681 (Ala. 1991), on remand, 594 So.2d 689
(Ala.Crim.App. 1992). See also Kynard v. State, 631 So.2d 257
(Ala.Crim.App. 1993). "This court has condemned the failure to strike white venirepersons who share the same characteristics as black venirepersons who were struck." Bishop v. State, 690 So.2d at 500.
We have also considered the other factors articulated in Branch. Here, the prosecution used its first four strikes to remove black prospective jurors and its fifth strike to remove a white juror who indicated that the circumstantial evidence would have to be overwhelming for him to vote to convict. It then used its next nine strikes to remove black prospective jurors and used it final two to remove white prospective jurors who it stated, had had prior misdemeanor or traffic offenses. The State used 12 of its 15 strikes to remove black veniremembers. We consider this relevant when examining the merits of this Batson claim. Ex parte Thomas, 659 So.2d 3 (Ala.), on remand,659 So.2d 14 (Ala.Crim.App. 1994).
This Court is aware of only one conviction that was reversed because the Russell County district attorney's office had violated the principles of Batson. See Owens v. State, 531 So.2d 22 (Ala.Crim.App. 1987). The voir dire in this case covered portions of five volumes of the record. It appears that the jurors were questioned equally about their views concerning capital punishment; however, there is no discussion concerning any prospective jurors' prior misdemeanor offenses or traffic offenses. Thus, the voir dire provides no support for some of the reasons advanced by the prosecution. From the record it appears that the prosecutor engaged in disparate treatment when striking Yancey's jury.
This Court will reverse a trial court's ruling on a Batson objection if it is clearly erroneous. Ex parte Drinkard, 777 So.2d 295
(Ala. 2000); Farrior v. State, 728 So.2d 691
(Ala.Crim.App. 1998); Brown v. State, 705 So.2d 871 (Ala.Crim.App. 1997); Owens, supra. A ruling is clearly erroneous if a reviewing court is left with the belief that a mistake has been committed. *Page 9 
See Owens. The record supports Yancey's claim that a mistake has been committed; therefore, the trial court's ruling was clearly erroneous.
For the foregoing reasons, Yancey's conviction and his sentence to death are due to be reversed. This case is remanded to the Circuit Court for Russell County for proceedings consistent with this opinion.
REVERSED AND REMANDED.
MCMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
[1] Timothy McVeigh was convicted of exploding a bomb in front of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, on April 19, 1995. The blast killed and injured many people.
[2] In Yancey's brief to this Court, defense counsel argues that the juror number 184, a white person, was not excluded after he indicated that he had returned a not guilty verdict in a previous trial. The jury master list shows that this juror was a black male who was removed from the venire before strikes were made. *Page 796